# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

TORY JEHON OVERSTREET,

Defendant-Appellant.

UNPUBLISHED
March 22, 2016

No. 323646
Kent Circuit Court
LC No. 14-000116-FC

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JEFFREY LEE SLAUGHTER-BUTLER,

Defendant-Appellant.

No. 323763
Kent Circuit Court
LC No. 14-000118-FC

Before: O'CONNELL, P.J., and MARKEY and MURRAY, JJ.

PER CURIAM.

These appeals have been consolidated. In Docket No. 323646, defendant Tory Overstreet was charged with felony murder, MCL 750.316(1)(b); armed robbery, MCL 750.529; three counts of assault with intent to commit great bodily harm less than murder, MCL 750.84; felon-in-possession of a firearm, MCL 750.224f; and possession of a firearm during the commission of a felony, MCL 750.227b. In Docket No. 323763, defendant Jeffrey Slaughter-Butler was charged with felony murder, armed robbery, three counts of assault with intent to commit great bodily harm less than murder, and felony-firearm. Following a joint trial, defendants were convicted of all the charges and appeal by right. We affirm.

On December 29, 2012, Kevin Harris, George Woods, and Jashawn Tatum were with Jason Cherry in the basement at 1249 Dickinson Street in Grand Rapids, Michigan, where Cherry was selling marijuana. Four men, all armed, entered the basement. Gunshots were fired, and Cherry, Harris, Woods, and Tatum were hit. Cherry died. The armed men stole marijuana and cash that had been sitting on a table in the basement. At trial, Isiah Latham and Craig

-1-

Hureskin testified that Tamaine Foster had devised a plan to rob Cherry and that they, along with Overstreet and Slaughter-Butler, participated in the robbery.

## I. EVIDENTIARY ISSUE RAISED IN DOCKET NOS. 323646 AND 323763

Overstreet and Slaughter-Butler argue that the trial court erred in admitting a rap video, titled "Getting' Doe," because the video was irrelevant or unfairly prejudicial. We review a trial court's evidentiary decisions for an abuse of discretion. *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008). An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes. *Id.* at 217.

Generally, relevant evidence is admissible. MRE 402; *People v Roper*, 286 Mich App 77, 91; 777 NW2d 483 (2009). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401.

We conclude that the trial court abused its discretion in holding that the rap video was relevant to Slaughter-Butler's intent because it was a celebration, by the participants, of the commission of violent crimes and robberies. The rap video was played one time for the jury. After reviewing the video, we conclude it would have been impossible for the jury to understand the lyrics, except for a few select words, after hearing it just one time. Nonetheless, we may affirm the trial court's decision to admit the video if the trial court reached the right result even if for the wrong reason. *People v Maynor*, 256 Mich App 238, 243; 662 NW2d 468 (2003).

Because Latham and Hureskin offered relevant testimony, the question whether they testified truthfully and accurately was itself relevant. *People v Mills*, 450 Mich 61, 72; 537 NW2d 909 (1995). Moreover, their credibility was challenged. Both Latham and Hureskin testified that they were in a rap group, PBI, and that those in the rap group who were associated with the present case included Foster and Slaughter-Butler. It was undisputed that these four men, but not Overstreet, were in the rap video. Thus, the rap video had a tendency to make it more likely than not that a close connection or a relationship existed between the testifying codefendants and Slaughter-Butler that did not exist between Latham, Hureskin, and Overstreet. Both Latham and Hureskin attributed to Slaughter-Butler what one could believe was a greater culpability in the death of Cherry than to Overstreet. Hureskin testified that he saw Slaughter-Butler with a rifle, both when Slaughter-Butler got out of his car in the alley and when Slaughter-Butler returned to the car, but he did not know if Overstreet had a gun. Latham testified that while Overstreet ran from the basement and did not fire his gun, Slaughter-Butler stayed in the basement and shot his AK-47. Because the rap video showed a connection between the testifying codefendants and Slaughter-Butler and because Latham and Hureskin attributed an apparent greater culpability to Slaughter-Butler than to Overstreet, the rap video had a tendency to make it more likely than not that Latham and Hureskin were testifying truthfully and accurately. MRE 401. Consequently, because we agree that the rap video was relevant, we do not find that the trial court abused its discretion in also so concluding.

Relevant evidence, however, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. MRE 403. All relevant evidence is prejudicial to some extent. *Mills*, 450 Mich at 75. It is only unfairly prejudicial evidence that should be

excluded. *Id*. Evidence is only unfairly prejudicial if a danger exists that marginally probative evidence will be given undue or preemptive weight by the jury. *People v Schaw*, 288 Mich App 231, 237; 791 NW2d 743 (2010). The assessment of the probative value of evidence against its prejudicial effect requires a balancing of several factors, including the time necessary to present the evidence, whether the evidence is needlessly cumulative, how directly probative is the evidence to the fact at issue, how essential is that fact to the proponent, the potential for confusing or misleading the jury, and whether there exists evidence with fewer harmful collateral effects to prove the fact. *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008).

The rap video was 4-1/2 minutes long, so it took little trial time to present. Latham and Hureskin testified that they were members of PBI, as were Foster and Slaughter-Butler, and that they had been rapping for 10 or 11 years. Because of this testimony, the rap video constituted cumulative evidence of a connection or relationship between the testifying codefendants and Slaughter-Butler. Nonetheless, the rap video need not be characterized as "needlessly" cumulative. *Id*. The rap video provided objective evidence, not dependent on the credibility of any witness, that Slaughter-Butler rapped and had a prior long-standing relationship with Latham and Hureskin. The issue of Latham's and Hureskin's credibilty was essential to this case. They were the only witnesses who testified about the actions of Overstreet and Slaughter-Butler on December 29, 2012. Although the rap video did not directly prove either Latham's or Hureskin's credibility, it was supportive of the argument that because Latham and Hureskin apparently blamed their "brother" Slaughter-Butler more than Overstreet, they were credible.

We are, however, mindful that this Court in codefendant Foster's appeal concluded that the rap video was "highly inflammatory" as it "was rife with profanity, misogynistic lyrics, drug references, and general references to violent and offensive behavior" and improperly admitted into evidence. *People v Foster*, unpublished opinion per curiam of the Court of Appeals, issued May 19, 2015 (Docket No. 320136). While may agree with this characterization of the rap lyrics and the *Foster* decision, we also note that the video's lyrics are very difficult to understand, so our agreement only comes after listening to the rap video numerous times. While several offensive, derogatory words can be understood the first time one listens to the rap video, those terms are not necessarily beyond what one would reasonably expect to hear in a rap video, nor do they render the video "highly inflammatory" in the context of *this* case and the purposes for which it was introduced here versus in *Foster*. In *Foster* the prosecution sought to admit the video to show the defendant Foster's intent and motive. This basis for admitting the video in this case was entirely different, and we are not constrained to reach the same conclusion as we did in *Foster* that its admission was erroneous.

Based on the above considerations, we conclude that the rap video as used in the instant joint trial was not unfairly prejudicial under MRE 403. The rap video was relevant; it showed a connection between the testifying codefendants whose credibility was at issue and Slaughter-Butler. Although the probative value of the rap video was minimal, the danger that it would be given undue or preemptive weight was also minimal. *Schaw*, 288 Mich App at 237. It indeed contains "profanity, misogynistic lyrics, drug references, and general references to violent and offensive behavior," but unless one watched the rap video numerous times, the vast majority of the lyrics cannot be understood. Because the hard to understand rap video was only played once at trial and its purpose for admission limited, we conclude that its probative value was not substantially outweighed by the danger of unfair prejudice. MRE 403. And, generally, a trial

court's decision on an evidentiary matter, even if a close call, cannot be an abuse of discretion. *People v Sabin (After Remand),* 463 Mich 43,67; 614 NW2d 888 (2000).

In doing so, we note that even were the video's admission an abuse of discretion, the evidentiary error was harmless. Generally, the erroneous admission of evidence is a nonconstitutional error. *People v Whittaker*, 465 Mich 422, 426; 635 NW2d 687 (2001). "[A] preserved, nonconstitutional error is not grounds for reversal 'unless after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (2001), quoting MCL 769.26. A review of the evidence admitted at trial shows that Latham and Hureskin each testified consistently with the other and with the other evidence. This consistency weighs in favor of concluding that Latham and Hureskin were credible.

When considering Overstreet's convictions based on an examination of the entire cause, we conclude it does not affirmatively appear that it is more probable than not that an error in the admission of the rap video was outcome determinative. *Lukity*, 460 Mich at 495-496. The jury knew that Overstreet was not in the video. Moreover, Overstreet did not dispute that he was in the basement; rather, he claimed that because he ran from the basement, he did not intend the commission of any crime. But Latham and Hureskin testified that Overstreet entered the basement armed with a weapon with three other armed men after a plan had been devised to rob Cherry and that Overstreet subsequently shared in the stolen marijuana. There was overwhelming evidence that Overstreet aided and abetted the felony murder, the armed robbery, and the assaults. See *People v Robinson*, 475 Mich 1, 7; 715 NW2d 44 (2006) (listing the elements of aiding and abetting); *People v Carines*, 460 Mich 750, 759; 597 NW2d 130 (1999) (discussing felony murder and accomplice liability). Where the evidence indicates that Latham and Hureskin were credible and their testimony provided overwhelming evidence that Overstreet aided and abetted the crimes, it does not affirmatively appear that it is more probable than not that an error in the admission of the rap video was outcome determinative. *Lukity*, 460 Mich at 495-496.

Similarly, regarding Slaughter-Butler's convictions based on an examination of the entire cause, we conclude it does not affirmatively appear that it is more probable than not that an error in the admission of the rap video was outcome determinative. *Id.* At trial, Slaughter-Butler argued that he should be acquitted because there was no credible evidence that placed him in the basement. But the testimony of Latham and Hureskin placed Slaughter-Butler in the basement, and, as previously stated, the consistency between their testimony and the other evidence presented bolstered the contention that Latham and Hureskin were credible. Accordingly, any error in the admission of the rap video was harmless.

Slaughter-Butler also argues that admission of the rap video, which he likens to "gang affiliation" evidence, violated his right to due process. The argument is without merit. The admission of evidence may violate a defendant's due process rights if it is "fundamentally unfair." *Coleman v Mitchell*, 244 F3d 533, 542-543 (CA 6, 2011). The Sixth Circuit cases defendant cites regarding the erroneous admission of irrelevant evidence of gang membership simply do not stand for the proposition that such evidentiary error is so "fundamentally unfair" as to violate a defendant's right to due process.

## II. REMAINING ISSUES RAISED IN DOCKET NO. 323646

Overstreet argues regarding the felony-murder charge that the trial court erred when it failed to instruct the jury that it needed to separately determine his guilt from the guilt of Slaughter-Butler. But because defense counsel expressly approved the jury instructions, with the exception of the felon-in-possession of a firearm instruction, we must deem the claim of instructional error waived, *People v Kowalski*, 489 Mich 488, 503-504; 803 NW2d 200 (2011), so there is no error for the Court to review, *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000).

In the alternative, Overstreet argues that defense counsel was ineffective for failing to object to the absence of an instruction informing the jury that it had to separately consider his guilt and the guilt of Slaughter-Butler. To establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance fell below objective standards of reasonableness, and that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceedings would have been different. *People v Uphaus (On Remand)*, 278 Mich App 174, 185; 748 NW2d 899 (2008). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001) (citation omitted). Because Overstreet did not move for a new trial or a *Ginther*[1] hearing, our review of Overstreet's claim is limited to mistakes apparent on the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

We decline to address whether defense counsel's performance fell below objective standards of reasonable because, as will be discussed, there is no reasonable probability that but for defense counsel's failure to request a multiple defendants instruction the result of Overstreet's trial would have been different. *Uphaus*, 278 Mich App at 185. Although in its final instructions the trial court did not instruct the jury that it must separately determine the guilt of Overstreet and Slaughter-Butler, it had previously given the jury such an instruction. Before jury selection, the trial court instructed the venire members that "the jury will need to consider the guilt or innocence of each defendant as to each charge separately." Then, during its preliminary instructions, the trial court instructed the jury that "each defendant must be judged separately on the evidence, and the jury must consider the case of each defendant separately and independently from the other." In its preliminary and final instructions the trial court instructed the jury that it was to consider all of its instructions, taken together, as the law governing the case. A jury is presumed to follow its instructions. *People v Breidenbach*, 489 Mich 1, 13; 798 NW2d 738 (2011). And the two verdict forms required the jury to reach each verdict separately for Overstreet and Slaughter-Butler and, in effect, reinforced the trial court's instructions. Furthermore, there was overwhelming evidence that Overstreet, even though he ran from the basement, had the *mens rea* required for a felony-murder conviction, i.e., that he not only intended to commit the underlying felony, but also to kill or cause great bodily harm or had wantonly and willfully disregarded the likelihood of the natural tendency of the behavior to cause death or great bodily harm. See *Carines*, 460 Mich at 759. The evidence showed that

---

[1] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

Overstreet entered the basement wearing a mask and armed with a weapon with three other men, who were also armed, after a plan had been devised for them to rob Cherry. The evidence also showed that Overstreet shared in the stolen marijuana. Under the circumstances, the absence of a multiple-defendants instruction from the final jury instructions does not undermine confidence in the outcome of Overstreet's trial. *Carbin*, 463 Mich at 600.

Overstreet also argues that because he was not in the rap video, defense counsel was ineffective for failing to request a limiting instruction regarding the video. See MRE 105. Overstreet's argument assumes that the rap video was admissible only in respect to Slaughter-Butler. Certainly if the rap video was relevant to prove Slaughter-Butler's intent because the men in the video rapped about committing violent crimes, then it would only be relevant to Slaughter-Butler. But as discussed *supra*, the rap video was relevant to prove the credibility of Latham and Hureskin, and evidence regarding the credibility of the two testifying codefendants was relevant to the charges against Overstreet and Slaughter-Butler. Because the rap video was relevant against both Overstreet and Slaughter-Butler, defense counsel's failure to request a limiting instruction did not fall below objective standards of reasonableness. *Uphaus*, 278 Mich App at 185. Moreover, as discussed *supra*, even if the rap video were erroneously admitted, it is not more probable than not that the error was outcome determinative in Overstreet's trial. *Lukity*, 460 Mich at 495-496. Therefore, the alleged failing of defense counsel in not requesting a limiting instruction could not have resulted in a different outcome in Overstreet's trial. *Uphaus*, 278 Mich App at 185.

## III. REMAINING ISSUES RAISED BY COUNSEL IN DOCKET NO. 323763

Slaughter-Butler argues that the trial court erred when it denied his motion for a new trial, which was based on the "finger-pointing" of Overstreet's counsel during closing arguments. We review a trial court's decision on a motion for a new trial for an abuse of discretion. *People v Rao*, 491 Mich 271, 278; 815 NW2d 105 (2012).

Codefendants may be tried in a joint trial. See MCR 6.121(A). They do not have an absolute right to separate trials. *People v Bosca*, 310 Mich App 1, 44; 871 NW2d 307 (2015). However, "[o]n a defendant's motion, the court must sever the trial of defendants on related offenses on a showing that the severance is necessary to avoid prejudice to substantial rights of the defendant." MCR 6.121(C). Because Slaughter-Butler did not move for a severance before trial, he is only entitled to relief if he demonstrated that having a joint trial was prejudicial. See *People v Hana*, 447 Mich 325, 346-347; 524 NW2d 682 (1994).

Slaughter-Butler claims that the "finger-pointing" of Overstreet's counsel prejudiced him because it could have only been derived from conversations between Overstreet's counsel and Overstreet. This claim is not supported by the record, which does not indicate the substance of any conversations between Overstreet and his counsel. Moreover, nothing on the record suggests that the statement of Overstreet's counsel that the "skinny and frail" man seen by Harris "turns out to be" Slaughter-Butler was based on anything but the evidence presented. Harris testified that the last man who carried a rifle had a very thin build and was the tallest of the four men. Notably, the jury had a chance at trial to observe Slaughter-Butler. In addition, Latham testified that Slaughter-Butler took an AK-47 into the basement, and Hureskin testified that Slaughter-Butler had a rifle. Furthermore, in his closing argument, the prosecutor had already

argued that the man whom Harris saw carrying the rifle was Slaughter-Butler. Thus, even absent the statement of Overstreet's counsel that the "skinny and frail" man seen by Harris was Slaughter-Butler, Slaughter-Butler still needed to defend an argument that the evidence showed that he was the man who came into the basement with an AK-47. Slaughter-Butler was not prejudiced by the statement of Overstreet's counsel. Because there was no prejudice to Slaughter-Butler, the trial court did not abuse its discretion by denying his motion for a new trial.

Slaughter-Butler also argues that the trial court erred when it denied his motion for a new trial based on newly discovered evidence without holding an evidentiary hearing. The newly discovered evidence was Latham's recanted testimony. We review a trial court's decision to hold an evidentiary hearing for an abuse of discretion. *Unger*, 278 Mich App at 216-217.

When a motion for a new trial is predicated on the affidavit of a recanting witness, before passing on the witness's credibility, the trial court should have had the opportunity to observe and hear the witness at the original trial or at a hearing on the motion for a new trial. *People v Blair*, 44 Mich App 469, 471; 205 NW2d 183 (1973). The trial court presided over the trial of Overstreet and Slaughter-Butler; thus, it heard the testimony of Latham at the original trial. The trial court also heard Latham testify at Foster's trial. Additionally, the trial court took Latham's guilty plea, and, because it also sentenced Latham, it heard Latham's displeasure at the fact that, despite testifying on several occasions, the prosecutor's office only lowered his minimum sentence by two years. Because Latham appeared before the trial court on several occasions, giving the trial court numerous opportunities to assess his credibility, the trial court did not need to hold an evidentiary hearing to assess Latham's credibility before deciding Slaughter-Butler's motion for a new trial. *Id*. The trial court did not abuse its discretion in denying Slaughter-Butler's request for an evidentiary hearing. *Unger*, 278 Mich App at 216-217.

## IV. STANDARD 4 ISSUES IN DOCKET NO. 323763

Slaughter-Butler raises numerous claims of ineffective assistance of counsel. Because Slaughter-Butler did not raise these claims in a motion for a new trial or a *Ginther* hearing, our review of them is limited to mistakes apparent on the record. *Heft*, 299 Mich App at 80.

Slaughter-Butler claims that defense counsel was ineffective for failing to cross-examine Latham and Hureskin about their bias toward him, which resulted after Eddie Moore and Patrick Grover, his cousins, planned to testify against them. Nothing on the record indicates that any cross-examination of Latham and Hureskin about Moore and Glover would have resulted in evidence suggesting that Latham and Hureskin gave false testimony. Accordingly, Slaughter-Butler has failed to overcome the strong presumption that defense counsel's performance in cross-examining Latham and Hureskin was sound trial strategy. *Carbin*, 463 Mich at 600.

Slaughter-Butler also argues that defense counsel was ineffective for failing to cross-examine Harris about inconsistencies in his testimony and his previous descriptions of the suspects. Slaughter-Butler does not identify any statements by Harris that were inconsistent with his trial testimony. A defendant may not leave it to this Court to search for a factual basis to sustain his position. *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008). Consequently, Slaughter-Butler has failed to overcome the strong presumption that defense

counsel's performance in cross-examining Harris was sound trial strategy. *Carbin*, 463 Mich at 600.

Slaughter-Butler next argues that defense counsel was ineffective for failing to discover that the records for his telephone number were not obtained by a search warrant and for failing to object to the admission of the records. However, because nothing in the record indicates that the police did not obtain a warrant for the telephone records, Slaughter-Butler has failed to establish the factual predicate for his claim. *Carbin*, 463 Mich at 600. The claim is without merit.

Additionally, Slaughter-Butler claims that defense counsel was ineffective because he failed to interview Detective Erik Boillat, who was qualified as an expert in the analysis of cellular telephone records and testified about Slaughter-Butler's records. But, nothing in the record establishes that defense counsel did not interview Boillat. Slaughter-Butler has again failed to establish the factual predicate for his claim, so it is without merit. *Id.*

Slaughter-Butler further claims that defense counsel was ineffective for failing to obtain an independent expert to examine the telephone records and for failing to call that expert as a witness at trial. The failure to call a witness only constitutes ineffective assistance of counsel if it deprived the defendant of a substantial defense, *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004), which is one that might have made a difference in the outcome of trial, *In re Ayres*, 239 Mich App 8, 22; 608 NW2d 132 (1999). The record does not indicate how an expert witness, if retained, would have testified at trial regarding the cellular telephone records. Accordingly, Slaughter-Butler has failed to show that he was deprived of a substantial defense. The claim of ineffective assistance of counsel is without merit. *Carbin*, 463 Mich at 600.

Slaughter-Butler next claims that defense counsel was ineffective for failing to request an instruction regarding voluntary manslaughter, which is a necessarily lesser included offense of murder. *People v Mendoza*, 468 Mich 527, 541; 664 NW2d 685 (2003). Thus, when a defendant is charged with murder, the jury must be instructed on voluntary manslaughter if the instruction is supported by a rational view of the evidence. *Id.* To prove voluntary manslaughter, "one must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions" *Id.* at 535. The element that distinguishes murder from manslaughter is malice. *Id.* at 540. Even though there was some evidence that the shooting did not start until after Cherry reached for his gun, a rational view of the evidence does not support an instruction on voluntary manslaughter. The evidence showed that the four men who entered the basement intended to rob Cherry and that each of them was armed and had his weapon out when entering the basement. Regardless how the shooting actually started, the four men, by committing an armed robbery of a drug dealer, acted, at a minimum, with the intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result. See *Carines*, 460 Mich at 759. Because a rational view of the evidence did not support an instruction for voluntary manslaughter, any request for an instruction on voluntary manslaughter would have been futile. Defense counsel was not ineffective for failing to make the futile request. *Unger*, 278 Mich App at 256-257.

Slaughter-Butler also claims that defense counsel was ineffective for failing to object to the recording of the 911 telephone call because it was irrelevant and only introduced to elicit an

emotional response from the jury. The recording of the 911 telephone call was relevant. Because Slaughter-Butler was charged with felony murder, the prosecutor needed to prove that there was a killing of a human being. *Carines*, 460 Mich at 759. Cherry's father testified that his wife called 911 after he heard gunshots. The 911 telephone call, in which Cherry's mother told the 911 operator that there had been a shooting in the house and Cherry was dead, had a tendency to make the existence of consequential facts—whether and when Cherry was killed—more probable than it would be without the evidence. MRE 401. Although the recording of the 911 telephone call was relevant, its probative value was minimal. Several witnesses who were present in the basement when Cherry died testified at trial. And, in fact, the 911 call did not provide any details about Cherry's death. Additionally, the recording carried a risk of injecting considerations extraneous to the merits of the lawsuit, such as affecting the jury's emotions or sympathies: The jury heard Cherry's mother nearly immediately upon learning that her son had been shot and was dead. See *People v Pickens*, 446 Mich 298, 337; 521 NW2d 797 (1994). Nonetheless, defense counsel was not ineffective for failing to object. Slaughter-Butler did not dispute that Cherry was killed; he only disputed whether he was one of the men who entered the basement. The 911 telephone call in no way implicated Slaughter-Butler as one of those men. Moreover, the emotion Cherry's mother displayed was not beyond what one would expect from a mother who just learned that her son had been shot dead. The jury was instructed that it was not to let sympathy or prejudice influence its decision. Under these circumstances, defense counsel's performance in failing to object to the recording of the 911 call did not fall below objective standards of reasonableness. *Uphaus*, 278 Mich App at 185.

Next, Slaughter-Butler claims that defense counsel was ineffective for failing to object when at the very end of his closing rebuttal argument, the prosecutor appealed to the jury's civic duty and sympathies. Assuming, but without deciding that the challenged remark was improper, we find that Slaughter-Butler has failed to overcome the strong presumption that defense counsel's performance in not objecting constituted sound trial strategy. *Carbin*, 460 Mich at 600. There are times when it is better not to object to an improper comment. *People v Horn*, 279 Mich App 31, 40; 755 NW2d 212 (2008). Where the jury had listened to three closing arguments and a rebuttal closing argument, which included an argument by the prosecutor that the facts showed that defendants were guilty, defense counsel may have believed it was best not to object. Objecting may have prolonged the prosecutor's closing rebuttal argument and delayed the jury's receiving their final instructions. In sum, we conclude that defendant has failed to establish that defense counsel's performance fell below objective standards of reasonableness. *Uphaus*, 278 Mich App at 185.

Slaughter-Butler also argues that defense counsel was ineffective when he failed to object when the prosecutor improperly elicited testimony from Latham and Hureskin that their plea agreements required them to testify truthfully. A prosecutor may not vouch for the credibility of his witnesses by implying that he has some special knowledge of their truthfulness. *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). But merely referring to a plea agreement that also contains a promise of truthful testimony does not warrant reversal. *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). Rather, the admission of evidence of such an agreement is error when the prosecution uses it to suggest that the government has special knowledge that is not known by the jury that the witness was testifying truthfully. *Id.*

The prosecutor's elicitation of testimony from Latham and Hureskin that each entered a plea agreement that required truthful testimony was not misconduct. *Id.* Accordingly, any objection would have been futile, and defense counsel was not ineffective for failing to raise a futile objection. *Unger*, 278 Mich App at 256-257.

In so ruling, we note that in his closing and rebuttal arguments, the prosecutor mentioned that Latham's and Hureskin's plea agreements required them to testify truthfully. Nevertheless, the prosecutor never suggested that he had special knowledge that was unknown to the jury that Latham and Hureskin, in fact, testified truthfully. Rather, whenever the prosecutor mentioned the plea agreements, he argued that Latham and Hureskin were credible because of the substance of their testimony, i.e., they implicated their "brother" Slaughter-Butler and their testimony was consistent with and corroborated by other evidence. A prosecutor may comment on the credibility of his witnesses, especially when credibility is at issue. *Thomas*, 260 Mich App at 455. A prosecutor is free to argue from the evidence and reasonable inferences that a witness is credible. *Bahoda*, 448 Mich at 282; *People v Bennett*, 290 Mich App 465, 478; 802 NW2d 627 (2010). Accordingly, the prosecutor's remarks during closing and rebuttal arguments were proper, and any objection would have been futile. Defense counsel was not ineffective for failing to raise a futile objection. *Unger*, 278 Mich App at 256-257.

Next, Slaughter-Butler argues that the trial court's instruction on felony murder was erroneous because it did not include the element of malice. Because defense counsel expressed satisfaction with the jury instructions, the claim of instructional error is waived, *Kowalski*, 489 Mich at 503, and there is no error for the Court to review, *Carter*, 462 Mich at 215. Nonetheless, we note that the felony-murder instruction included all the elements of felony murder.

Finally, Slaughter-Butler argues that his convictions for felony murder and the underlying felony, armed robbery, violate his constitutional protection against double jeopardy. In *People v Ream*, 481 Mich 223, 240; 750 NW2d 536 (2008), our Supreme Court held that convicting and sentencing a defendant for felony murder and the underlying felony does not violate the prohibition against double jeopardy if each offense has an element that the other does not. Felony murder and armed robbery each contain an element that is not contained in the other crime. See *People v Smith*, 478 Mich 292, 319; 733 NW2d 351 (2007). Consequently, Slaughter-Butler's convictions of both felony murder and the predicate felony of armed robbery do not violate the protection against double jeopardy. *Id*.; *Ream*, 481 Mich at 240.

We affirm.

/s/ Jane E. Markey
/s/ Christopher M. Murray